The next case on calendar, Blecher v. Lohr, has been submitted, so we'll proceed to Hillside Drilling v. City of Berkeley. You may proceed. Thank you, Your Honor. Please, and just stay centered on the mic and you'll be audible. May it please the Court, my name is Gary Borski and I represent the appellant in this matter, Hillside Drilling. Essentially, the primary issue in this appeal is whether or not the lower court properly assessed the evidence in favor of the non-moving party on a summary judgment motion, which in this case was Hillside Drilling. The common nucleus of the Court's order in this case centered upon whether or not Hillside Drilling was required to submit Caltrans DBE certifications with its bid. On that issue, Hillside presented substantial evidence, including the expert declaration of Sean Silvera, who is a civil engineer who has had numerous projects with Caltrans, and who testified in his declaration that what the proper procedure is when using this DBE Caltrans form. Mr. Silvera testified in his declaration and under oath in his own deposition that he was given an option, that is, Hillside had an option, that in order to utilize a Caltrans form, they did not have to comply with the DBE requirements in the special bid package. Directing the Court's attention to its volume two of the excerpts of record 699, that is, the bidder DBE information form, Mr. Silvera in his declaration testified that if you look at the center block on that form, it states specifically, this information may be submitted with your bid proposal, discretionary language. If it is not, and you are the apparent low bidder or the second low bidder, it must be submitted and received as specified in Section 3-1, 0-1A. Those are the special provisions that the District Court relied upon in saying that Hillside had a responsibility to produce the Caltrans certifications. It is Hillside's position that it was an accurate evaluation of the facts, especially for the non-moving party in this case. Hillside has presented substantial evidence to prove that they had the option, if they were to submit this form marked as 699, then they did not have to comply with the special provisions at 3-1, 0-1A. But what did the specifications provide? The specifications provided that, well, you have to read it in conjunction with this form, Your Honor. Well, no, I just wanted to see what the specifications said. The specifications, assuming that this form was not used, the specifications said that you have to submit Caltrans DBE certification forms with the bid. Aren't they governing in the awarding of the contract, the specs? The specs, they are, Your Honor, but you have to understand, 699 was also part of the specs. Was it attached to the specs? Yes, Your Honor. Oh, I see. Became a part of the specs. Correct, Your Honor. This form 699 is the actual form attached to the specs. And you'll see when you look at the exhibit and the record that there's a dotted line and there's a note on the side of the form that says, detach from proposal the long cut line. Okay? So the point is Hillside had the option. They could either, one, use this form, and if they did, they did not have to go to the other portions of the special provisions. And that's exactly what's on this form. As the Court will notice, this is a standard Caltrans form. Mr. Servere, in his declaration, provided other Caltrans forms which used similar language. On this form, the city of Berkeley types in, you'll see a provision that's typed in, identifying the special provisions. At that point in time, they did, in fact, have the option to either, one, submit the form, or two, if they did not submit it, then when they submit their bid package, they have to provide DBE good faith effort along with the Caltrans certifications. And there's another point on the Caltrans certification issue, and that is let's assume that they did not hire any DBE subcontractors. Okay? There would be no Caltrans certification forms to present. Could they reject their bid then for not producing forms? No. So what was the purpose of submitting Caltrans DBE certification forms if, in fact, there was compliance with the Caltrans form? I think if this Court rules on this issue, it throws the rest of the lower court's order out the window, because the lower court relied extensively on this idea that Hillside had the obligation of producing the Caltrans DBE certification. Well, that's certainly the interpretation that the counsel placed on it, because they said you didn't comply with the requirements. The requirements do say, you say, well, we don't read it the same way. I mean, we as the bidder, we thought we could get away with doing it this other way. And the forms are misleading, so they should have given us the benefit of the doubt. But the specs that you cited, too, in fact, in those big letters say DBE information shall be submitted. Okay? So you're in that category. You're not somebody who didn't hire anybody and your client got up to 18 percent. But the city council says, no, that's what we mean. That's what our forms mean. So how are you proving a discriminatory intent or a violation here because the forms are misleading and you read them one way and they read them some other way? Three ways. One, what the city council did was more or less ministerial, because they delegated their authority down to Andreas Campos-Kruser, who was the director of Public Works. So, first of all, you have a delegation of authority downwards to the Public Works manager. What's the evidence of the delegation? Did they, in fact, approve by resolution? Yes, they did not. The city council? Okay, Your Honor, if we want to go with the resolution then, if we look at excerpts of record 0698, that is the specific resolution. 696 and 697 are what the Public Works manager recommended. Right. Recommended. Correct, Your Honor. Didn't make the decision. Recommended. I agree, Your Honor. Okay. But if we look at the resolution, all the resolution says is that Hillside, well, it says the lowest and second lowest bidders submitted which were nonresponsive. It doesn't say why they were nonresponsive. It doesn't say because they did not submit their DBE certifications. It only says that they're nonresponsive. It is Hillside's position that the evidence, if it looked at in a position most favorable to the nonmoving party in this case, we have presented substantial evidence to show that the city of Berkeley does, in fact, have a quota program mandating 20 percent. Well, I understand you have the Mr. P, I'll call him because I can't pronounce his full name. Padre de Honde. Padre de Honde. Thank you. So on 697, the recommendation that went to the city council says the lowest bid and second lowest bid were nonresponsive because their submittals lacked the disadvantaged business enterprise documentation. Okay, so that's what goes to the city council. Now you're suggesting that basically the city council rubber stamped that, so we have to trace back then to page 697. 697, in fact, does cite the regulation. It doesn't say because they didn't make a quota or anything. So where does that get you, assuming that the Campos Kreutzer has been delegated? Okay, Your Honor. What we have here is a ratification of what the lower echelon employees were doing. What's the connection between Mr. P and Kreutzer? Okay. Jack Padre de Honde admitted to Sean Sevier, and I think that's undisputed in this case, that, hey, you didn't get the bid because you didn't get the answer. All right, well, let's accept that. Let's accept that he did that. Let's assume that he said that. Then he prepares his memo. He testified also, and it's also a footnote in the court order, and I believe it's at on 764, excuse me, 765, footnote number 9. It says, it appears that the recommendation signed by Campos Kreutzer and presented to the city council was based on the above-reference draft prepared by Padre de Honde in December 1998. And we'll concede that point for the purposes. Jack Padre de Honde did, in fact, prepare this according to his own deposition testimony. He prepared which? The letter? The letter, correct, Your Honor, 696. Now. Was there any information? Was there a deposition of Campos Kreutzer to say that, I don't know, that Andreas, that's a male? No, Your Honor, there was not because Jack Padre de Honde said he prepared this memo. He prepared the memo. And forwarded it up for signature. Okay. And is there any evidence that Campos Kreutzer didn't exercise some independent decision-making authority in signing off on that? No, Your Honor. What he did was delegate his authority downward to Jack Padre de Honde. So your argument, then, is Padre de Honde is the final decision-maker in the bidding process? Correct, Your Honor, because he testified that he was. Was that argued to the district court? Yes, Your Honor. That he was the final decision-maker? Well, I'm not sure it was cast. You're saying he's been delegated. So for all purposes of the analysis of this case, your argument is that he has been delegated final decision-making authority. Everything that happened from Campos Kreutzer up through the city council is just ministerial rubber stamping. Correct, Your Honor, because Campos Kreutzer had nothing to do with the bid packages. He never reviewed them, had no knowledge of what was in them. All he did was receive a document from his lower echelon employee, who was delegated the authority to manage that specific project from beginning to end. So if Padre de Honde had some notion that was mistaken in his mind and thought this was a quota system, it goes up to his boss, who is relying on that, doesn't know that he's made that representation, looks and says, well, it says they didn't comply with our regulations, that they're responsible for, that is, Berkeley's responsible because neither the director of public works nor the city council knew what Padre de Honde had said? I think, Your Honor, that's stretching it too far, because you also have the issue of the fact that Hillside did, in fact, comply with the DBE requirements. Well, that's your argument, but let's assume that you were to lose on that, that there's ambiguity in the documents. But what the Berkeley city council and the director of public works thought they were doing was rejecting the bid because it didn't comply with the DBE form. And what's the evidence to suggest that they're part and parcel of a quota system that Padre de Honde communicated? We presented other evidence. This is more like a hybrid custom and policy argument under Monell. You have one, you have a delegation of authority downwards for ratification, which is one way of proving Monell. The second way would be showing past pattern and practices. I understand that, but before you move off ratification, ratification, does it not, includes a knowing ratification? That is, they have to know what it is they're ratifying. And I'm trying to understand where in your evidence Creutzer or the Berkeley city council knew what Padre de Honde had said so that they could have actually ratified it. Your Honor, I think also ratification requires that if they just can't rubber stamp something either, there has to be some sort of informed decision-making here. In this case here, they were not making an informed decision. I believe there's a case on that, and I believe it was also cited in the Appellee's papers. No, I don't believe it was cited by anyone, Your Honor. It was Hammond v. the County of Madeira, which is 859-797. And in Head Note 5 of that case, it talks about whether or not if a board ratifies the misconduct that gives rise to the county's liability, they may not, the decision-makers may not insulate themselves from liability by attempting to delegate themselves out of all responsibility. In other words, they just can't sit back and say, well, we're passing this down to Jack Padre de Honde, and you know what, we have some other municipal policies out here to talk about affirmative discrimination. For example, we presented evidence that they do in fact have a city ordinance requiring contractors to employ minorities at a certain percentage based upon the county of Alameda's representation of minorities. Was there any indication in the record that Padre de Honde's statement was conveyed to the counsel? No, Your Honor. So that's the problem I think we're facing, is that the counsel didn't have any, had no knowledge of the fact that he'd said about the quotas and so forth. Your Honor, but I did take the deposition of the person most knowledgeable, and they did designate both Jack Padre de Honde and Ken Kinesium, I believe that's how you pronounce his name. And in Mr. Kinesium's deposition, which is also cited in my brief, he did cite a policy which was they do have to have a certain percentage of minorities on a, minority subcontractors on a public works job. That was by their person most knowledgeable representing, I say county, the city. And that's a very important point, Your Honor, because what they're saying is if you don't hire any subcontractors who are DBEs, we're not going to accept your bid. And that was in Mr. Kinesium's deposition. And if you want me to take a minute, I can find it for you, the specific site. But that was pointed out. And so one now, we have the testimony of the city saying, well, if it's 100 percent non-DBE participation on a contract, we will not accept the job. We have Mr. Padre de Honde who tells Hillside Drilling that you're not getting the job because you did not meet the 20 percent quota. You have a city ordinance that's out there that says, well, we want contractors to hire a certain percentage of minorities in their workforce. And then you have the fact that the city, then you have the past pattern and practices of the city whereby not one single job, except for one in 1987, did they ever accept a bid that did not meet the quota. And in fact, on the times they did accept bids that did not submit Caltrans DBE certifications, they waived that because they're relying on the idea that, well, you know what, they're a sole bidder. That was a sole bidder situation? Yes, Your Honor. And that's the other issue there, too, Your Honor, is that in Mr. Silvera's declaration, he also presented the idea that the city can always reissue the bid and they do that all the time. And so that was a crutch that they're trying to rely upon, saying, well, you know what, there's all these contractors in the Bay Area and we can only find one contractor, and though they could not meet the DBE requirements, we still use them anyway. When looking at the totality of the evidence in the light most favorable to the appellant, it's obvious there's a pattern and practice of a quota system within the city of Berkeley for public works contracts. And that's her whole point. Okay. Do you want to save time for rebuttal? Yes, Your Honor. Okay. May it please the Court, Michael Wu, Deputy City Attorney for Appellee City of Berkeley. As this Court correctly noted in oral argument of my opponent, there was absolutely no evidence of delegation by the City Council to Jack Pagio-Honday, to the Director of Public Works, nor to the other official, the City Manager. Absolutely no evidence of delegation. And if we cut to the chase of this case, in order to hold a municipality liable for unconstitutional violations, you need to show an unconstitutional customer practice. As I'll explain later, there's just no evidence of that here. Well, let's assume that the city had an understanding that is reflected in what Mr. Pagio-Honday said. At an operational level, they clearly were not going to accept any bid that didn't meet the 20% cutoff. And the process then followed. What he would do is he'd make the decision, and then he'd write it up for his boss, and his boss would look at it and sign it. And the next level up, the City Manager would sign off on it, and go to the City Council as a consent item on the agenda. And boom, it's ratified. No council member could remember the hour after the whole thing happened, what happened on this particular bid, because they had about 100 other items. So in that process, does that create any litigable issue as to whether or not there's been de facto delegation down to the operational level, and therefore what Mr. Pagio-Honday has been saying really does represent the policy? No, Your Honor. Okay. What you're speaking to is the discretionary acts of an official final policymaker for the city. The Supreme Court has spoken on this issue in the case of Pembar v. City of Cincinnati. You have to show not only that the final official policymaker for the city exercises discretion in not overruling an unconstitutional decision, you have to show that the City Council, which is acknowledged to be the final policymaker here, made a deliberate choice to follow a course of action made from among various alternatives and knew the basis of Pagio-Honday's unconstitutional violation. There's just absolutely no evidence to support that here. Well, that's what I'm trying to wrestle with, whether there is or isn't. In other words, we're familiar with how municipalities work, and the City Council sitting at its policymaking level is necessarily relying on staff to work things up and the paperwork that goes through the bureaucratic process. If all they are doing as a practical matter is rubber-stamping what is put in front of them, they don't know what is actually transpiring at the operational decision-making level. They just, boom, sign off on what is presented to them, and that you can trace down to Pagio-Honday's level that he is the last person who actually exercised, in fact, exercised discretion. Is there any authority to say that that either is or isn't within or outside of Mon-El? I believe that that situation you're describing, Your Honor, is outside of Mon-El. It seems to me you're describing a situation where you're holding the official final policymaker liable for the actions of an employee, the low-level staff member who you characterize as implementing this procedure. That's a responding superior argument, which Mon-El addressed squarely. Here, there's just no evidence that, here, only the City Council can make that official policymaking decision, and there's no evidence that it was aware of what Pagio-Honday did or didn't do. In fact, the evidence is the City Council had not a clue as to what percentage were in the bids that were submitted for this project, let alone a specified percentage. In the pertinent documents for the results from this bid, one is the bid abstract sheet, which is generated at the time, contemporaneously with the opening of bids. There is no mention as to any specified percentage achieved by a bidder. In the City Manager report, there's no mention of percentages. In the resolution, there are no mention of percentages. Indeed, the bid specification that requires the middle of DP certificates with the bid was written in advance of receiving any bids, so the City Council would have no knowledge, anyone would have no knowledge, of what percentage any particular bidder will ultimately submit that may be qualified or unqualified. This case was decided on a summary judgment, and isn't there an inference to be drawn from Pagio-Honday's statement and the fact that 16 and the 17 all met the quota of 20 percent, and that we have a specification with an attached bid form that is ambiguous as to whether they really have to provide it? Isn't that enough as far as inferences to be drawn that would survive summary judgment? No, Your Honor. Let me address the DBE form first because that's Hillside's central argument here. The fundamental flaw that they make is that they believe those two forms are identical, and they are not. The requirement in the specifications to submit the DBE certificates is a separate requirement. I'm not hearing you. It's a separate requirement when submitting the DBE form. Hillside's corporate representative, Sean Severa, testified that submittal of a DBE form is a separate requirement from submittal of DBE certificates, and he testified that a contractor must review the bid specifications to learn when he needs to submit the DBE certificates. Now, Your Honor, also raises Pagio-Honday's, quote, omission as an inference. Well, Your Honor, for the purposes of the summary judgment motion, as well as the purposes here on the bill, we're going to assume as true that Pagio-Honday did admit to rejecting Hillside's bid because of a quota system. So that's not an issue here. The issue is whether you can hold the municipality liable for what Pagio-Honday did or didn't do. Is that an inference to be drawn from that, that that was the city council's position and that's why he said that? No, I think the only inference we can draw from that is that's what Jack Pagio-Honday said, and that's what he believes. Why wouldn't that be powerful evidence that that's the practice? That's the practice, that they have an unlawful practice that has been going on, and that's why I was trying to understand before this whole notion that there's no discretion being exercised up the chain after Jack Pagio-Honday. He understood that the practice is, and he's been implementing it, and nobody's exercising any oversight or discretion. Well, Your Honor, I don't believe that. So as a practical matter in the city of Berkeley, unless you're the sole bidder, you don't get, you're out if you don't meet the 20 percent. I don't think there's any evidence, Your Honor, that Pagio-Honday stated that that's the practice of the city for having a quota system. Well, no, that's the inference one draws from his statement. But even drawing that inference, you have to, I mean, I think it's well settled in the Ninth Circuit and the Supreme Court that you have to focus on the official decision-maker for the city in order to hold them liable for unconstitutional violation. And if I go back to Judge Powell's question regarding the pattern and practice with respect to the 19 federally funded projects that were awarded over an 11-year period, 17 of which were awarded to the lowest responsive bidders who also happened to meet the DBE goal, I think the only inference one can draw there, and it's the finding of the trial court, is that the city council follows the requirements of this charter, which requires it to award to the lowest responsive bidder. There's nothing nefarious about that. And with respect to the two out of the 19 bidders that were awarded to the sole bidders for those projects who were alleged to have been DBEs themselves, evidence then spewed that since they were the sole bidders, the city risked losing federal funds if they were not to award to them. Isn't that just more evidence that there may be some factual issue that inheres in this? In answer to some of your questions that Judge Hugg answered, I think, you were referring to a number of these things. But on page 26 of your brief, you have this statement I find rather bothersome, and it's about in the middle. It says, as the district court correctly found under the city's DBE program and so on, the contractors must submit the DBE utilization report. That correctly found, doesn't that lead us to a conclusion that you're relying on a fact finding there, which deprives you of the opportunity of summary judgment? I apologize, Your Honor, but you were breaking up as you were talking. It was hard for me to make out your question. I think he was saying on page 26 of your brief, you cite the district court as having found. Correctly found. That sounds in terms of a judgment of fact or a finding of fact. A summary judgment. How can that be? Okay, Your Honor. Page 26 of my brief references the district court's finding that in connection with submittal of a DBE, of a draft DBE program to Caltrans pursuant to federal requirements, they attached a form that's titled M-W-DBE form, and that form clearly states that DBE certificates must be submitted with a bid. That document was submitted by the city of Berkeley to Caltrans for approval to show compliance with the federal requirements for having a DBE program. So I believe to the extent the court, the district court made that finding, it was an appropriate finding that is supported by the evidence. No, they don't. The district court doesn't make findings at the summary judgment stage. I misspoke. The district court did not find that there was any dispute as to a material fact with respect to when DBE certificates must be submitted. When you said that the 16 were the lowest responsive bidder, that would be a true statement in this case as well. So what's the evidence to suggest that the people who were, was there anybody in those prior 16 who were thrown out because they didn't, as said here with Hillside, didn't include the DBE form? No, Your Honor, I don't believe that any bidder in the 16 projects were thrown out because of failure to submit a DBE form. When I say responsive, it means that the bidder who was awarded the project complied with all of the requirements from the bid specifications such that their proposal was a responsive proposal. So that's what I understood. And let's say you could say the same thing here. So this statistic will now go in. Another case would come along and add this. Now there would be 17 where the lowest, the bid went to the lowest responsive bidder because two were thrown out. That's right. They were lower in fact, but they didn't meet the DBE requirement. That's correct, Your Honor. The final award to Trinet, who was the third lowest bidder, that bidder supplied all of its response time. I understand that. So I'm trying to go back to your 16 now. When you say qualified, it's not the lowest bidder. You say it's the lowest responsive bidder. In this case, the lowest responsive bidder got the award. But that hides the fact, I'm not saying it's evil intent, but it masks the fact that there were two lower bidders who were not awarded because they were not responsive in any of those 16 prior bids. Was there anybody below, at lower amount of bid, below the one to whom the bid was awarded but who were not responsive? I do not know the answer to that question standing here, Your Honor. Okay. And there was no evidence to suggest? There's absolutely no evidence to suggest that a bid was awarded to a responsive bidder who complied with DBE programs over the bid of a lower bidder who simply submitted their good faith documentation. There's absolutely zero evidence of that. All right. Thank you. Thank you. Counsel for Hillside also mentions a declaration submitted by an alleged expert, Sean Silvera. I submit to this Court that that declaration should not be considered, and to the extent the trial court did not consider it, it had good reason to do so because that expert declaration by Sean Silvera, the expert, refutes Sean Silvera's deposition testimony as Sean Silvera, the corporate representative. For instance, Mr. Silvera opines as an expert that DBE certificates did not need to be, and could not have been feasible to have been submitted with the bid, while his deposition testimony states the contrary, that indeed it was possible to submit DBE certificates with the bid. What about Mr. Knessian, who was designated you as a person most knowledgeable, who is said to acknowledge the policy with respect to hiring only a certain percentage, that they had to have a minimum percentage of minorities? I'm glad you brought that up, Your Honor. Kenneth McKnessian, who was designated as a person most knowledgeable, I believe what my opponent was referring to was his testimony where he responded that he believed it's an obligation under a DBE program that the contractor has to make an effort to set aside some portion of work for DBEs. That policy is a policy which is maintained by Caltrans as well as by the federal government. It's their policy that requires that certain portions, that the contractor make an effort to set aside portions of the work so that they can fulfill the DBE participation goal. Here, Hillside is not challenging the constitutionality of the DBE program. In fact, has acknowledged it's constitutional. So that's not an issue before you. So what we have here are two other governmental authorities who have the same provision that Mr. Knessian testified he believed as being the policy. Okay. Well, and with that, unless Your Honor has further questions, I believe I'll submit the matter. Okay. Judge Gibson, any questions? No questions. All right. We'll hear rebuttal from Mr. Gorski. Thank you, Your Honor. Addressing that last issue. Wait, get up to the. I'm thinking I'm in trial. Yeah. Addressing that last issue, the deposition, the relevant deposition testimony is, it's excerpt of record 482, and that's actually page 122 of his deposition, and the question for me was commencing at line 1 to line 6. So can I clarify? It's your testimony, then, if the contractor does not 100 percent, that's not the word meet, meet 100 percent of the work himself, that would not be acceptable to the City of Berkeley because they're not meeting the underlying policy, which is that some of the work should be given out to DBE subcontractors. Is that right? There's various objections between counsel and myself. And then the final answer is at lines 21 and 22, the witness. That is my understanding of how the DBE works. Secondly, on his deposition testimony, which is page, well, excerpt of record 415. This is the Director of Public Works? No, this is, well, Your Honor, I served what is called a deposition of the person most knowledgeable because you cannot take the deposition of the city per se, so they designate who is going to speak on behalf of the city. And they designated this individual to speak on behalf of the city. Okay. So this is actually the city's. What was his position? His position was he was similar to Jack Ponchihonde higher up, though, in the food chain, so to speak. But he was one of the top engineers there that oversaw all this. Okay. He basically wrote, and as I cited in my record, he's the one that actually prepared the DBE program they relied upon for over the years, which is what counsel here was talking about was approved by Caltrans. And that's what I'm going to address next because in that program, and it's on page 27 of his deposition 415 of the excerpts of record, Exhibit 4 to that, which is the DBE program from November 1997 through October 1999. This was a program, in effect, at the time Hillside submitted its bid, and that's 501 of the record. And actually down below on that also, it shows that questions and comments, comments and questions, engineering division, he was the person that you contact regarding the DBE program. When I asked him the questions about that DBE program, he testified, and I asked a question, could you find in that program marked as Exhibit 4 any reference to a requirement that Caltrans certifications are to be produced with a bid? And his answer is no. I asked him another question. So I understand your testimony. In Exhibit 4, which is the Disadvantaged Business Enterprise Program, from November 1, 1997 through October 31, 1999, that program marked as Exhibit 4, there was a requirement of a participation goal for DBEs of 20 percent, but nothing was mentioned about the production of Caltrans certifications with a bid. Is that correct answer? Yes. Okay. Your time is up. I'm sorry. Thank you. The cases argued will be submitted. We thank counsel for their argument, and we'll stand in recess for the day. And Judge Gibson, we'll pick you up shortly from our other phone. I'll be ready. Thank you. Okay.
judges: Hug, Gibson, Fisher